Today of our sitting in Jacksonville this week, Judge Hull and I welcome Judge David Proctor from Birmingham, Alabama. Judge Proctor has been a district court judge for 15 years and so he brings a lot of experience and wisdom to our panel this week and we thank him for his service. We'll call the first case, which is United States v. Harris. Mr. Bansoni? Good morning, Your Honors. May it please the court, counsel. Bill Stansoni representing Delexsia Harris. Your Honors, I'd first like to address the standard of review in this case. There is some difference between the government and I over the standard of review. My client was charged with witness tampering and obstruction of justice and counsel filed a motion in limine to keep out and limit evidence concerning a murder of a gentleman by the name of Sciola Lazier. The government argues in their brief that counsel did not raise an objection as to, under the 403 balancing test in his brief, but that is inaccurate, completely inaccurate. The government's brief on page 21 says, quote, Harris did not challenge that evidence in the district court on Rule 403 grounds. However, in document 43, which was in the district court, in the motion in limine, quote, even assuming the evidence is somehow relevant under Rule 401 pursuant to Federal Rule of Evidence 403, what limited probative value the evidence has is substantially outweighed by the danger of unfair prejudice to Ms. Harris and would also lead to jury confusion of the issues and mislead the jury. See Rule 403. Then the motion in limine went on to talk about the different types of trial M&A. Counsel, I was trial counsel, said that the government wants to wave photographs of the murder of Sciola Lazier around the courtroom. This case is going to become a murder trial. Why wasn't at trial, why wasn't the evidence of the participation of conspiracy to murder relevant to show that your client acted corruptly in misleading investigators and tampering with witnesses? Well, Your Honor, even if it is relevant in the district court . . . You conceded. You did not raise relevance. I'm not going to . . . It's relevant. I'm conceding that it is relevant. The district court did rule that as to the obstruction of justice charge. Government needed to show some evidence about the murder of Sciola Lazier because Ms. Harris talked to law enforcement about that murder. However, Your Honor, this is essentially a line drawing case under Rule 403. When does the evidence about a murder in a case where the defendant is not accused of murder and is not being tried for murder cross the line? Approximately 80% of this four or five day trial was about the murder of Sciola Lazier. Almost every single witness in the trial testified as to some aspect about the murder of Sciola Lazier. But the evidence is credited to the government as far as its presentation of evidence. At trial, your client's misleading of law enforcement occurred within a few minutes of the murder right? According to the government, yes, Your Honor. Well, that's what the jury found. The jury found that she tampered with a witness and misled the law enforcement, correct? Yes, Your Honor. There are other areas of obstruction of justice that the jury could have hung their hat on. That is true, Your Honor. But in this case, and I want to bring Your Honors to a couple cases that this court has cited to about where you should draw the evidence as to the murder is relevant as to the obstruction of justice charge. In opening statement, the government capitalized on the district courts allowing in evidence of the murder of Sciola Lazier. In opening statement, the government told the jury that the evidence in this case will show that in the early morning hours of July 3rd, 2012, the defendant, Alexia Harris, lured a man named Sciola Lazier to his death. They waited for her to get clear and then they rained bullets down on the car executing Sciola Lazier. From that statement, this entire case became a murder case. This entire case became a murder case. Then I'll just talk about the other evidence in just a minute. Can you help me understand where the line should have been drawn in your view? Obviously, there has to be some evidence of the murder so that there is some context to what witnesses were tampered with and why. Right. And how obstruction occurred through misleading of law enforcement. So where's the line you're suggesting? Well, the government crossed the line in opening. The government crossed the line... I'm not asking if the government crossed the line. Okay. Where are you drawing the line? I'm drawing the line that where this court in United States v. Meter, 762 F. 2nd, 867, that's 11th Circuit, 1985, over rule 403 objection, similar posture. This court allowed evidence of a murder used by the government to establish that the defendants participated in a drug conspiracy. So it's similar in the case where the underlying charge wasn't a murder, but the judge allowed in evidence to establish their participation. However, the court stated in that case, this is a close question. The government furnished only minimal details of the homicide and the government did not seek to introduce photographs of the body. In this case, and I understand what your Honor's asking, and it's difficult. Where is the line drawn? In that case, there was only minimal details. In the court, this court said it was a close case. In the case before, in the case of D'Alexia Harris, there weren't minimal details. Days and days went on about the... But counsel, here the details are important because we can't know whether she lied to law enforcement until we know what happened. Correct, your Honor. I understand that. But let me just point your attention to government's exhibit 28, your Honor. This is actually government's exhibit 21. This is a composite exhibit. I filed this as supplemental authority. I don't know if... A supplemental appendix. I don't know if your Honor can see this from there. This was introduced at trial. Mr. Lazear was shot multiple times by an AK-47. It was an extremely graphic murder. The details of this murder, when it went into explicitly, including this photograph. This is a photograph of the car being completely shot up and there's Mr. Lazear's body slumped over in the car, bleeding. My position, your Honor, is that there is no evidentiary value as to this photograph. Well, evidentiary value of the pictures was to show that your client's story told on the night of the murder simply didn't add up, right? That she acted as if she had just simply cleared the door of the car when bullets started hitting and she ran away. And it was clear, if you look at the pictures, that the shooting occurred from both the driver's and the passenger's side. And therefore, she would have been in the line of fire if her story were true. Correct, your Honor. However, there were multiple photographs that could have been used. And there were other photographs. Five introduced total? Yes, your Honor. And the government takes issue with what counsel said about this photograph being waved around the courtroom. And that's accurate. It wasn't waved around the courtroom. It was put on an Elmo. But when this picture was put on an Elmo, I was in the courtroom, it's put up onto a six-by-six screen. You can't come, this and the details about the murder, this photo that does not show any contradiction. This photograph does not show any contradiction to what D'Alexia Harris said. She got out of the car and she ran. She didn't even look back and bullets were flying. This photograph doesn't contradict that. This photograph is clearly meant to inflame the jury. And your Honors, in closing argument, the government capitalized it again. And again, remember, her brothers were on trial for this murder, along with some other people. And that's where they were in, the murder happened in 2012. They were indicted in 2014. And on the eve of trial, Ms. Harris was indicted for witness tampering and obstruction of justice. And the witness tampering really came out from a bunch of Facebook posts. The government alleges she was trying to get witnesses not to come to testify. So four years . . . She also had direct contact with a potential witness and made a reference to her children, right? That was an allegation, yes, Your Honor. No, that was evidence of fraud. Yes. You're required to look at this verdict and draw the conclusions that the jury would have drawn in order to uphold the verdict. Correct, Your Honor. But even in looking, even if there was enough evidence to sustain, to uphold the jury conviction without some of these evidence that was allowed in, in United States v. Hans, that if the fundamental fairness of a trial in looking at a whole was compromised by the introduction of evidence and different inflammatory things that were said, it doesn't matter whether there was enough evidence if those errors weren't there. And in closing statement, let me just say briefly, Your Honor, the government said, if this family, the Harris family, is one thing it's loyal, she, Ms. Harris, is with Ceola Lazier for one reason, to lead him to his slaughter. Again, Your Honor, this case was a murder case and it . . . all of the evidence, everything I brought up, the counsel brought up in his brief, the admission of improper hearsay, the admission of co-conspirator hearsay, the admission of statements that, that weren't in further conspiracy, the admission of a protective order that was violated in the Nathaniel Harris case, all of that concerned the murder of Ceola Lazier. The protective order, this jury, there was a protective order issued in the Nathaniel Harris case as to the witnesses. There was an alleged violation of that protective order. I don't even know exactly how it happened. But the jury in this case, in the Alexia Harris case, was told about that violation of a protective order. There is absolutely no evidence that Ms. Harris knew about that protective order, violated any protective order, and the government was . . . and the government, in this case against Alexia Harris, was talked about a protective order and governments and witnesses that had to be sequestered, clearly insinuating that Ms. Harris was the one that violated this protective order. The government said it was more atmospheric. That's why they needed the evidence. Well, the government argues that it's probative of whether the recipients of Ms. Harris' communications would have reasonably interpreted those as threats, right? That's what the government says is probative of. I don't even know whether . . . it wasn't even clear whether the witnesses knew that there was a protective order. It's just . . . Well, it indicates the dangerousness of the situation, whether or not Ms. Harris knew about it, or whether any of the other witnesses knew about it. I understand, Your Honor. If I can just finish my thought. However, the protective order, in and of itself, and whether there was a violation, did not go to any of the elements of the crime she was charged with. This is just more evidence to possibly . . . to actually inflame the jury, jury confusion, to show that this person is essentially being tried as a vicious murderer in a witness tampering case. I concede the balance of my time. Thank you. I'll give you a full two minutes for rebuttal, Mr. Chairman. Thank you. Thank you, Your Honors. May it please the Court, I'm David Rhodes for the United States. This case is about witness tampering and obstruction of justice, but it's about witness tampering and obstruction of justice in an underlying federal proceeding that involved violent men, including several of the defendant's brothers, and violent acts, including seven murders. This case could not have been told to the jury without talking about these murders. One of those murders, Brenton Coleman, that led to the defendants appearing, as Judge Proctor mentioned, before LaWanda Evans and saying, you need to be loyal to the Harris family, and if you're not, it would be nothing for you and your four children to just disappear. So there's another murder there, and a threat of five more murders. That's without even talking about the Lazier murder. Another one of those charged murders was the Bo Lazier murder, and there, yet again, is the defendants obstruction of justice, where she made up that story, fabricated it from whole cloth, told it to law enforcement in order to protect her brothers, who ended up being charged in the underlying federal proceeding, and of course, herself, because she took part in it. The fact of the matter is, we have obstruction of justice and witness tampering involving very violent acts here, and there's no way to tell that story without talking about the underlying acts. It's particularly so when the defendant is fabricating a story, because we have a burden of establishing to this jury, beyond a reasonable doubt, that the story was false in the first place, that the defendant knew that the story was false. That applies both with respect to charged Act IV, the Ciola Lazier story, and Act III, which was charged when she tried to get LaShawn White to provide a false alibi for Charlie Green, because Charlie Green had been her boyfriend, and he was one of the people who took part in the murder of Ciola Lazier. We had to show that this wasn't just somebody who is asking somebody to cooperate with a defense attorney. That's not a crime. Just like we had to show this wasn't somebody who was just cooperating with law enforcement, telling them what she had seen that night, that's not a crime either. We had to show that she was obstructing justice. So that's why all of this evidence came in. And there was a lot of evidence about the murder, but it's misleading to say that so much of this evidence was about the murder, because most of the evidence that came in, which came in through Detective Cirulla, was about her fabricating a story about the murder. In terms of the murder itself, we had very little evidence, although it was significant evidence. What we had was we had Chris Barton testify for about 10 pages about the murder itself. We had his friend John Green testify to corroborate what he had said one page. And then we had LaShawn White testify about it. She had been at home when they started, and she was there when the defendant came back afterward. She testified for maybe 16 pages. That's not that much of this trial. The vast majority of it was Detective Cirulla explaining the story that the defendant told, the investigation, and all the reasons why that story was untrue. How did the photograph of the death scene contradict Ms. Harris' statements to Detective Cirulla? Okay, if I could, I will answer that. If I can explain the backdrop of how the photos came in first. At the hearing on the motion in Limonee, where the court said this murder evidence is relevant, we're going to let that in. We mentioned, the defendant complained about the possibility of our waving around photos, which I understand. We explained the five photos that we intended to introduce at trial, one of which is the one that you're talking about, Your Honor, that shows the decedent. And the court said at that hearing, well, this evidence is relevant. If there's anything inflammatory, we'll deal with that. I'll deal with that at trial, anything that's particularly inflammatory about the murder. Then at trial, when we offered the evidence, these five photos, the same ones that we had described, there was no objection by the defendant to the introduction of those five photos. So that's the backdrop for how these photos came in. And several of the photos showed a variety of things. They showed where the shooters had been, because they showed where the shells were. They showed where this Phantom Mercedes Benz truck could not have been at the time. They showed the shots going through the closed passenger side door of Mr. Lazear's car, which showed, one, that the defendant hadn't been just jumping out of the passenger seat, because one, she would have been hit, and two, she wouldn't have had the wherewithal to close the door behind her. And there's the one photo that you're talking about, which showed the defendant. Excuse me. I have the five photos, and I think he makes a fair argument. I don't know if it's enough to require reversal, but you could have, that's the passenger side photos. Right. Okay, and you've got two of the passenger side photos. You've got it clear on the passenger side, and then you've got this on the driver's side. But all you have to do is redact the blood in the body right here. I mean, you can just cover that up and just say there's that, so. So you're saying there's just no need to have him. I mean, what is the need? There may not have been a need, well, there was not a need to have him. I would say two things to that, Your Honor. You can just cover this up, and then we don't have to get into all this. I understand that. I mean, it's just using some discretion. I agree. Not to create a difficult issue on appeal. Right. Believe me, I agree with you. I understand that, Your Honor. I mean, I think there's- It's so simple to do. I understand. Thank you. So I would say about that two things, which I totally understand your point, Judge Hall. One is, it shows part of the defendant's story was that Mr. Lazier knew who these people were, knew that they were following him. He said he was prepared. He had his gun on his lap. And her story said, as they parked in front of her house, this truck came up alongside them. So that suggests that he would have taken some action when these people were there. But if you look at that photo, I'm not saying that tells the whole story of the photo, but the implication from that photo is that he was surprised and he did nothing. Try this. Even if it was error to have the body there, why was it not reversible error, given the weight of the evidence? Well, there's no question about that, Your Honor. It's not that prejudicial. I mean, these- No, it's not, because we already have a story- I mean, that's what you kind of have to argue. I understand. It's not that prejudicial. Yes, it is somewhat prejudicial. But given how many bullet holes went in there, you've got to know the body's in there. Exactly. And you can be confident that there are much more explicit photos of the decedent there. I understand your point completely, but we're talking about a photo that just shows what the evidence already established, that 30 to 40 bullets went into this vehicle while he was sitting there. And so that is not going to change the outcome of the trial, Your Honor. If I can explain a little bit about the standard of review issue and to explain. I don't think the standard of review matters at all here, because this evidence clearly was relevant. In fact, there really was no way to tell this story without talking about this murder. But the defendant had filed a motion in limine, which he referred to, and he said in there that this evidence about the murder wasn't relevant because the indictment charged threats against witnesses. And that might be true, because the original indictment didn't refer to the lies to law enforcement. But in the meantime, we had filed a bill of particulars that identified both the lies to law enforcement and trying to get LaShawn White to provide a false alibi. We listed all four of those. So at the hearing on the motion in limine, that's when the court said, I'm not sure if you're pleading the indictment covers these things the way it is pleaded right now. So there was an issue there about, I guess in theory, the relevancy of this evidence with respect to the original indictment. And that's why we obtained a superseding information with the defendant's agreement after that that specifically included all four of the charged act. So at that point, the relevancy objection, which was based on the original pleading, went by the wayside. And therefore, I mean, we're not saying that the defendant didn't argue this initially, or maybe that's the way it looks from the brief. But what we're saying is once we had a new operative pleading the superseding information, his original argument no longer governed. His original argument with respect to the motion in limine. But that's neither here nor there, because this evidence was so not only relevant, it was so critical to the case. And if you look at the evidence that came in, other than perhaps that one photo, which really just visualized the murderous acts that occurred as the result of the defendant, her brother, and the two other co-conspirators who took part in that. So that would be harmless, even if it were wrong. And again, the defendant never even objected. I mean, if he had objected when we offered those five photos and said, keep that one out or take the defendant out, they could have had an argument. The court could have had a decision on whether that should come in. But that didn't happen, because the defendant didn't object to the introduction of that evidence. Unless the court has any further questions, I don't know. No? Thank you. Thank you. Your Honor, as to the superseding information was discussed at the motion in Lemony. And it might have cleared up counsel's argument as to the relevancy, which is 401. But as I told Your Honor, Judge Proctor, that I'm conceding that it is relevant under 401, but we're essentially here. Were there a lot more graphic pictures that could have been introduced of the crime? Well, there was everything to autopsy photos. There were a lot of photographs. So there were pictures that were more graphic than this one that either were not offered or not received. That's correct, Your Honor. That is correct, Your Honor. The district court indicated at the motion in Lemony hearing  and said, we'll deal with that at trial. Well, Judge Bucklew was aware of that. But we did discuss these photographs. And Your Honor, counsel's position is under Tampa. She clearly ruled at the motion in Lemony argument, which went on for over 45 minutes, that these were coming in. And so at trial, remember, 80% of this trial was about the murder of Sciola Lazier. Those photographs, which we already looked at, didn't come in through objection because there was a definitive ruling as to those. And she wasn't going to let in any others, but there was a definitive ruling as to those. My recollection is she looked at this photo. My recollection is. My recollection is, Your Honor. Also, as to the dispute by way of that transcript again, am I going to see where you objected to this photo in particular? I can't recall. I apologize, Your Honor. I just can't recall. And I have a question. Did she look at these other photographs that you say there were more gruesome photographs? Did she see those at all? Or just the government never presented them? I don't think the government, as to some of the extremely graphic ones. I'm sure there were a lot more photographs. There were a lot. Because there was a murder trial going on. There's going to be 30 photographs. I did a lot of murder trials. Tried a lot of murder cases, day in and day out. And you try to just not have an error. And you keep the really bad ones out and put the easy ones in. Prosecutor always wants lots of photographs. The only thing I would just. She didn't see all these other ones. No, she did not, Your Honor. All she saw was these five. She might have seen some more. I'm not 100% certain. But she did not see a large portion of them. So the only thing I'd just like to close with briefly, Your Honors, is that as this court has said, there is a line that can be crossed under a 403 analysis. And in this case, it did happen. Chris Barton, the government stated, did testify. He was actually the getaway driver. He testified in detail about the murder of C.O. Lazier. He was never even indicted for the murder. This case became a murder trial. Thank you. I see that your court appointed. Yes, Your Honor. We very much appreciate your service. Thank you. Thank you, counsel. We're going to take a five minute recess before the next case. Thank you.